SAN ANTONIO & ARANSAS PASS RAILWAY COMPANY v. EDGAR MIDDLEBROOKS.

Decided December 11, 1909.

**1.—Personal Injuries—Negligence—Insufficient Evidence.**

In a suit by a brakeman against a railroad company for damages for personal injuries received while uncoupling cars, evidence as to the movement of the cars and the manner in which the accident occurred considered, and held insufficient to warrant a conclusion that the defendant's employees were negligent in operating said train of cars and therefore insufficient to support a verdict and judgment against the defendant.

**2.—Same—Contributory Negligence.**

Where a brakeman while uncoupling a train of moving cars, without the knowledge of the engineer operating the train, unnecessarily, "inadvertently and unthoughtedly" places his foot in the coupler of the car he was on, and was injured by the coming together of the cars, evidence considered, and held insufficient to show that the result or any like result could have reasonably been foreseen by the defendant's employees.

Appeal from the District Court of Lavaca County. Tried below before Hon. M. Kennon.

*Patton & Schwartz,* for appellant.

*Paulus & Ragsdale* and *R. B. Allen,* for appellee.—The verdict of the jury is not contrary to and against the evidence introduced upon the trial of the case, but is supported by the testimony. International & G. N. Ry. Co. v. Ormond, 64 Texas, 485; Texas & Pac. Ry. v. Davison, 68 Texas, 370; East Line & R. R. Ry. Co. v. Smith, 65 Texas, 167; Gulf, C. & S. F. Ry. Co. v. Silliphant, 70 Texas, 623; St. Louis & S. F. Ry. Co. v. McClain, 80 Texas, 86; Galveston, H. & S. A. Ry. Co. v. Henefy, 115 S. W., 57; Galveston, H. & S. A. Ry. Co. v. Sullivan, 115 S. W., 615; Kansas & G. S. L. Ry. Co. v. Dorough, 72 Texas, 108; Texas & P. Ry. Co. v. Murphy, 46 Texas, 356.

REESE, ASSOCIATE JUSTICE.—This is an appeal from a judgment

of the District Court for $6500 in favor of appellee, as damages for personal injuries alleged to have been received by him by having his foot caught and crushed between the couplers or drawheads of two cars, while he was engaged in the performance of his duties as a brakeman in the service of appellant. A motion for a new trial was made and overruled.

The case, as stated in the amended petition, is that the train on which plaintiff was a brakeman was at the town of Moulton, at which place it was necessary to set out a water-tank car, on which plaintiff was riding, and which was next to the engine. Plaintiff, for this purpose, uncoupled the car from the car next to it, and signaled to the engineer and fireman to go forward with the engine and tank car, in order that this car might be placed on the switch, where it was to be left. After uncoupling the car and giving the signal plaintiff discovered that he had not disconnected the air-hose. Plaintiff then turned the air-cock on the air-hose, and in getting back to his proper place on the tank car the remaining portion of the train which had been uncoupled continued to move towards the car on which plaintiff was riding, bumped up against the same and caught his foot and crushed it. It is alleged that the engineer only partially obeyed plaintiff's signal to go ahead, and only went ahead a short distance and stopped. That if he had kept on, the uncoupled part of the train would not have run against the car on which plaintiff was riding.

Appellant answered by general denial and general demurrer, and specially excepted that the allegations of the petition showed that the accident was caused by plaintiff's own negligence, which was also specially pleaded as a defense.

The court overruled the demurrer, and upon a trial with the assistance of a jury there was a judgment for plaintiff as above stated.

We conclude that the assignments of error to the ruling of the court upon the demurrer should be overruled.

The assignments of error as to the insufficiency of the evidence to support the verdict and judgment, and that they are without evidence to support them, must be sustained. The only evidence as to the manner in which the accident occurred and the movement of the cars is the testimony of appellee and the fireman on the engine. The following is the testimony of the appellee as to the manner in which the accident occurred, and the material facts connected therewith:

"I was a brakeman at the time of my injury on the Sap railroad; I was working as a student brakeman. The duties of a student brakeman are to follow the instructions of the conductor; whatever he says he is to do it. I received instructions what to do on that trip. The work we were to do at Moulton that day was to unload local and set a car out. We were traveling south from Cameron going towards Yoakum, the end of the division. There was a car to be set out at Moulton, and in order to set that car out it was necessary for a brakeman to uncouple the cars and make a flying switch and drop the car in the siding. The car to be set out at Moulton that day was a flat car with two water tanks on it; a flat car is about eight feet wide and twenty-eight feet long and is attached to other cars by

coupler at each end. The coupling pin is drawn by a lever from one end of the car to the coupling when a coupling pin is desired to be drawn or when a coupling is desired to be made. That lever is a piece of iron about three feet in length, and then makes a kind of an elbow with about a foot for a handle, and that is to lift the coupling pin and uncouples the car. This lever is right even with the decking of the car, right at the top of the car. In uncoupling a coupling it can be made from the ground; and it can also be made from the top of a flat car. After you have made an uncoupling of a car from the balance of the train and the air-hose has not been disconnected, in the event of a separation of that car from the remaining portion of the train the air blows out of the pipe and wastes the air in the engine; the engineer looses his air. That air can be saved by turning the angle-cock. The angle-cock is situated sort of right under one side of the coupler, below and to one side of the coupler about three inches; that angle-cock is a kind of a trick you turn just like a faucet, only you can just turn it one way and let the air go through, or you can turn it back and it will be cut off. The handle of that faucet is about four or five inches long. You can be on the car or on the ground, either one, to make that uncoupling, to turn off the angle-cock. I uncoupled the car in this instance at Moulton, and I was on the lefthand side of the train going south at the time I uncoupled it. I gave the go-ahead signal to the fireman. There was nothing left undone at the time I gave the signal that should have been done by me prior to signaling the engineer, except to uncouple the air-hose. I knew what would happen with the engineer and the air in his train if it was permitted to be pulled apart rather than to be cut off. After I discovered the fact that the air was not uncoupled I run down and turned the angle-cock to save the air in the water car and the engine, and it took me about two seconds to do that. I did it as quickly as I could. I succeeded in cutting off the air. My signal had been obeyed. I know that because the car separated, the one that I was on from the rest of the train. I am positive of that fact, that they separated. In my judgment about eighteen inches to two feet space existed between the drawheads. When I made this uncoupling the train had almost stopped; I couldn't tell whether it had stopped or not. It had almost come to a stop. I caught the pin and gave the signal to go ahead and that signal was obeyed. My foot got caught in reaching down to turn the angle-cock to save the air in the engine and the water car. I put my foot in the coupler to brace myself and he stopped the engine and the other cars rolled down on me and caught my foot. I put my foot in there as a brace to rise up from off my knees and the other car ran down and caught my foot while I was in that position. I had been working for the railway company at that time as a student brakeman since January 16, 1907; I had made one run for pay prior to that time, on the 14th of February, and this accident was on the 27th of February. I have no idea how far the engineer went with the train before he stopped. At the time I started to get up on my feet at the place I did, with reference to the signal

I had given, I thought the engineer was going on; I believed then he was going on. The fact that the cars were separating is what led me to that belief. If the engineer had continued and obeyed my signal and gone on, my foot would not have been caught by this train from behind, because I would have got up if he hadn't stopped his engine. I would have been up in one more second or more. I was not on the ground; I was on the car. Had he moved forward with the car I was on it would have been on the side track. It would have been going away from the rest of the train and been cut loose from the engine. The duty of a fireman in connection with signals given him by brakeman is that he has got to obey the signals the same as the engineer and he has to give them to the engineer. When he sees a signal he has to communicate it to the engineer. At the time of my injury I had been in the employment of the San Antonio & Aransas Pass Railway Company since the 16th of January and this occurred on the 27th of February. This was the beginning of my service with the railway company in that department. I had been in the employ of the company some time before that as a car repairer, about sixteen months before. The character of my services as car repairer was looking after the cars and fixing them up. I had to fix all broken parts or disordered parts of them and was familiar with the construction of cars. I know all about these couplers; they frequently had to be repaired while I was in that service and I know them thoroughly. I had been sixteen months in that particular service and knew how the cars were fastened and unfastened. It was a flat car with two water tanks on it that I was on; don't know exactly the size of the tanks. They were for the purpose of transporting water, and I guess they would hold about 1500 gallons each. They were, I guess, about six and a half or seven feet across the bottom and the car was about eight feet broad.

"I didn't attempt to couple these cars by getting down off the car. I said it was as convenient and safe to couple them on the top of the car as to get down and couple them. This coupler is an instrument invented to couple or uncouple a car without going between them; I did not have to get down between the cars because that is an invention to prevent that necessity; I also could have released this cock, which kept the air, from the bed of the car, and I did do it from the bed of the car. It is necessary in order to separate the cars to release both of them. They would tear apart if you did not release both of them. It is the duty of brakemen to uncouple and release them both. In properly uncoupling a car you would have to turn the angle-cock first. I accidently forgot to do that and released the coupler first, and afterwards discovered that I hadn't released the angle-cock and I did that afterwards. The proper way would have been to release the angle-cock and then uncouple the coupler. The air—the steam that fills these pipes—is applied to the brakes in some way so as to help in braking or stopping the train, and it is connected with the engine by pipes that are joined together with these couplings; they run the length of the train. When they are wanted to be uncoupled they turn the angle-cock to keep this air or steam from escaping, and then you uncouple the car. I forgot

to do this at the time, and I discovered that I had not turned the angle-cock so as to save the steam, and I got down to do that, and when I did that I went to get up and put my foot between the couplers and got it cut. I got my foot caught by this other train that I had uncoupled, coming up on me; they were separated about eighteen inches, the drawhead of the car. They could not have been more than that or they would have turned loose the air. I said then they had about come to a standstill. He pulled his engine up and the cars moved down on it. A kind of a grade or slack of the train was what pushed the cars down on me. I guess there was not a grade at the depot such as a train of cars would run away on at that point. They must have had some impetus from the engine to have moved; it could not have moved up from the air-hose. The train had not stopped at the time.

"I gave that signal (indicating by wave of the hand); that means to move on. There wasn't anything the matter with my eyes to keep me from seeing that that train was moving. I can see that that pencil is moving there. I wasn't paying any attention to the car moving, the one that was coming back; I was on the car in front. I was not looking back towards the work I was doing; I was turning the angle-cock and was looking where I was working; I was working down there between those two cars; I was turning the angle-cock when he stopped the train. I didn't reach down between the train and look way off the other way; I was looking down towards the ground.

"I had a book of rules furnished me, and in that was a rule requiring me not to go between cars for any service, and I was familiar with those rules. I understood the couplings of cars because I had worked on the construction of cars. I knew if the cars came together where I put my foot that they would catch it, and I knew it would hurt it pretty bad, likely mash my foot. I put my foot there in getting up, and if the engineer had kept going on it wouldn't have hurt it. I had uncoupled before I realized the air-hose was not uncoupled and discovered that; in a hurry I jumped down to do that, and in getting up I put my foot there without thinking. I knew it wasn't any proper place to put my foot. I knew that if it came together while my foot was there that would crush my foot. I did that inadvertently and unthoughtedly.

"My body never left the top of the car in making this coupling. The only portion of my body that was below the top of the flat car was that portion of my foot which extended down to the coupling. I put my foot down there for the purpose of bracing myself to get up, and I did that believing that the car upon which I was riding was going forward and it was going forward."

The fireman testified that before getting to Moulton there is a long down grade and then an up grade. That the momentum acquired by rolling down the long grade carries the train to the station; that upon the occasion in question the tank car was to be set out on a sidetrack at Moulton; that this was done every other day; that in doing this the train is stopped at a certain point, to allow the uncoupling to be done, at which time the engineer "blows out" his

engine, which requires about two minutes, when the tank car is set out on the siding by means of a flying switch. He testified that at the time of the accident he saw no signal from appellee (who was on the same side of the train that the fireman was, the fireman being in his cab on the lefthand side of the engine, and appellee on the far end of the tank car, on the lefthand side); that he was not expecting any signal to stop at that place, as they had not reached the regular place to stop and uncouple, and that the train had not, in fact, stopped until the stop was made which caused the accident, as stated by appellee.

None of this testimony of the fireman is contradicted by appellee except his statement that he had not received the go-ahead signal which appellee gave, and did not move ahead in obedience to this signal. It is not contended that the engineer saw or could have seen this signal, but the whole case, as to the negligence of appellant, is based upon the fact that the fireman saw the signal and in obedience thereto moved off with the engine and tank car causing them to separate from the balance of the train, and then came to a stop, whereby the balance of the train unexpectedly to appellee ran up and caught his foot in the coupling.

Assuming that appellee's testimony is true in every particular as to the facts testified to by him, his testimony that the fireman saw and partly obeyed his signal is his conclusion from the fact that the engine and tank car attached separated from the balance of the train to the extent of eighteen inches, the entire train not having come to a standstill, but continued moving at the time of the uncoupling and at the time he put his foot in the coupling, after turning the angle-cock of the air-hose. From the statement that it would have taken him only about two seconds after giving the signal to turn the angle-cock and get back to his position of safety on the car, it is apparent that the engine moved only a few feet after the signal was given. The separation of the car for that short space could and would naturally have followed the uncoupling of the train from the engine and tank car, and this fact affords no basis for the conclusion drawn therefrom by appellee that the engine had moved forward in obedience to his go-ahead signal. There was no necessity for appellee to have done this uncoupling before the train was stopped for this purpose, and it does not appear that the fireman had any reason to suppose that he would do so, or any occasion to be on the lookout for signals at that time and place. As we have said, the entire case as to the negligence of appellant rests upon the fact that the signal was seen and partly acted upon, inducing appellee to think that the engine would go ahead and the cars would continue to separate. We think that the conclusion of negligence on the part of the engineer and fireman can not be drawn from this testimony..

Upon another ground we think the evidence as to negligence fails. According to appellee's testimony, there was no necessity for him to place himself in a position where he could have been injured by the cars coming together. He uncoupled the cars from his place on the tank car by means of a device provided for that purpose. Before doing this it was his duty to disconnect the air-hose. Not only this,

but in disconnecting the air-hose and turning the angle-cock, after having uncoupled the cars, both parts of the train still moving and the distance between the cars being eighteen inches or at most not more than two feet, he placed his foot in the coupler of the car he was on. He testified that he did this without thinking, "inadvertently and unthoughtedly." How can it be said that such a result or any like result, or any injury of any kind to anybody, could have been reasonably foreseen as likely to occur from the moving forward of the engine a few feet and then stopping, conceding that the fireman saw the signal and did partly obey it as claimed by appellee? Without this there could not be actionable negligence.

It might be seriously questioned whether the act of appellee in the circumstances did not constitute contributory negligence as a matter of law, but we are of the opinion that this was a question for the jury. We are, however, of the opinion that there is no evidence to support the verdict, and that the jury should have been instructed to return a verdict for defendant. It appears conclusively to us from appellee's own' testimony that this is simply an unfortunate accident, lamentable in its consequences to appellee, but for which no blame can attach to the persons operating the engine. We have not referred to the contradiction between the testimony of appellee and previous statements made by him as to the manner in which the accident occurred. That was a matter for the jury. The evidence seems to have been fully developed, and we can see no good reason for remanding the cause. The judgment of the trial court is reversed and judgment is here rendered for appellant.

*Reversed and rendered.*

Writ of error refused.